724 F.Supp. 1013 (1989)
PUBLIC CITIZEN HEALTH RESEARCH GROUP, et al., Plaintiffs,
v.
COMMISSIONER, FOOD AND DRUG ADMINISTRATION, et al., Defendants.
Civ. A. No. 88-1492.
United States District Court, District of Columbia.
August 28, 1989.
On Motion To Modify Opinion September 29, 1989.
*1014 Patti A. Goldman, Alan B. Morrison, William B. Schultz, Public Citizen Litigation Group, Washington, D.C., for plaintiffs.
Gerald C. Kell, Office of Consumer Litigation, Civil Div., U.S. Dept. of Justice, Washington, D.C., Michael M. Landa, Associate Chief Counsel, Food and Drug Admin., Rockville, Md., for defendants.

MEMORANDUM OPINION
BARRINGTON D. PARKER, Senior District Judge:
In this litigation, plaintiffs Public Citizen Health Research Group ("HRG")[1] charge several responsible federal government officials with unreasonable delay in failing to promulgate long-needed regulations which would require tampon manufacturers to display meaningful, standardized absorbency information in packaging their product for sale. They seek declaratory and injunctive relief against the Commissioner, Food and Drug Administration ("FDA"); Secretary, Department of Health and Human Services ("HHS"); and Director, Office of Management and Budget ("OMB").[2] Plaintiffs charge that in the absence of such action by the defendants, women who frequently use tampons are exposed to the risks and possible contraction of the Toxic Shock Syndrome ("TSS") disease.
The parties have filed cross motions for summary judgment. Plaintiffs seek the immediate promulgation of a regulation which would require tampon manufacturers to sell their product in packages  displaying standardized absorbency information and containing unambiguous notices of the risks and dangers associated with continuous tampon usage. The defendants, FDA and HHS, argue that they have exercised reasonable and informed judgment in the matter, that federal courts have traditionally granted considerable discretion and deference to administrative agencies in discharging their responsibilities in the rulemaking process, and that the circumstances presented here do not warrant a departure from such principles. All defendants seek dismissal of plaintiffs' charges or hold that a grant of summary judgment is warranted on the facts.
The record in this proceeding shows clearly that the FDA has unreasonably delayed promulgating necessary regulations. It has been lethargic in responding to and carrying out its legal obligation, and thus has failed to adequately inform and protect the public on this important health issue. The Court therefore determines, and reluctantly so, that plaintiffs are entitled to immediate injunctive and declaratory relief.

I. BACKGROUND
There is little, if any, dispute about the sequence of events and underlying facts surrounding this litigation. Indeed, the parties' proffers of material facts submitted[3] and other pleadings reflect a near complete agreement on the chain of events and facts.

A.
Toxic Shock Syndrome is believed to be caused by a toxin-producing strain of bacteria. It is thought that the use of tampons enhances the growth of the bacterium. The term surfaced in the late 1970's *1015 when it was introduced to describe a rare, serious and potentially fatal disease.[4] Although the symptoms of the disease occur most often in menstruating women 30 years of age or younger, who use high-absorbency tampons, its incidence has been note among other ages. The disease is characterized by a marked drop in blood pressure and shock. Warning signs include a sudden fever (usually 102 degrees or more), vomiting, diarrhea, fainting or near fainting when standing up, dizziness, or a rash resembling a sunburn.

B.
Unusual attention was focused on the disease in 1980 when a tampon brand manufactured by Proctor and Gamble was linked to TSS. Later, the manufacturer voluntarily withdrew its product, labeled the "Rely" brand, from the market. However, women who used other brands continued to experience similar types of familiar and serious symptoms. Epidemiological studies and scientific evidence developed immediately before and after that time, showed that women who used high-absorbency tampons had a greater relative risk of developing TSS than those who used low-absorbency products.
In 1981, the FDA was aware of an epidemiological research study  Tri-State Toxic Shock Syndrome Study, Epidemiologic Findings ("Tri-State Study" or "Study"), 145 Infectious Diseases 431 (U.Chi., 1982). (Px. 3.)[5] The authors and investigative team responsible for the Study, included reputable and highly recognized public health officials and epidemiologists from the States of Minnesota, Wisconsin and Iowa. They reported that high-absorbency tampons carried an increased risk for TSS. The Tri-State Study concluded: "Another major finding ... is that women who use high-absorbency tampons had a greater relative risk of developing TSS than women who used low-absorbency tampons." Id. at 438. Upon reviewing those findings, the FDA tentatively agreed that the data supported the conclusion that "users of high-absorbency tampons have a greater risk of contracting TSS than users of low-absorbency tampons."[6] 46 Fed.Reg. 23,767 (1981). (emphasis added.)
The Tri-State Study was followed immediately by a report prepared by the Institute of Medicine entitled: Toxic Shock Syndrome: Assessment of Current Information and Future Research Needs ("Institute Report" or "Report"); (National Academy Press, 1982). (Px. 1.) The Report recognized that "The Tri-State case-control study, the most detailed of the six ... studies conducted to seek TSS risk factors for the menstrual cases, found that the use of high absorbency tampons increased the risk of developing TSS more than ... lower absorbency tampons." Id. at 4-5. Based on the then available information, the Institute Report advanced several important recommendations: that women who have had TSS should be advised not to use tampons and postpartum women should be informed that tampon usage is likely to increase TSS risk; and that adolescent women, especially, should be advised to minimize the use of high absorbency tampons. Id. at 85-86.

C.
Due to the findings of these reports, the FDA promulgated regulations shortly thereafter, mandating tampon manufacturers to warn tampon users of the risks associated with tampon usage and toxic shock syndrome. 21 C.F.R. § 801.430 (1982). The preface to the rule noted that *1016 as tampon absorbency decreased, so too did the risk of TSS. A provision of the regulation required tampon manufacturers to include within the labeling a statement advising women "to [use] tampons with the minimum absorbency needed to control menstrual flow." Id.
Moreover, the regulation was flawed and doomed from the start. While it did require that manufacturers provide a tampon absorbency warning, it failed to require them to use standardized terminology. No disclosure of the relative absorbency of a specific tampon brand as related to other brands on the market was required. Indeed, the FDA recognized that there was no voluntary standard, industry agreement, or other common understanding of the meaning of "super", "regular", or any word used by manufacturers to characterize absorbency. 47 Fed.Reg. 26,982, 26,987 (1982). Since women cannot reasonably identify lower tampon absorbency from product labeling, they cannot intelligently choose among tampons for the ones that would minimize their risk of contracting TSS. Id.

D.
Recognizing that women were still unable to make an intelligent and informed decision as to tampon absorbency amongst brands and thus avoid the risk of disease, on July 29, 1982, plaintiff HRG filed a Citizen Petition. (Px. 5.) The Petition called for the FDA to issue standards under § 2 of the Medical Device Amendments of 1976, 21 U.S.C. § 360d(a) which would prescribe standards and justifiable test methods for determining tampon absorbency; require tampon manufacturers, using the above mentioned standards and test methods, to determine the absorbency capacity of each style of tampon manufactured; establish uniform nomenclature for tampon absorbency, so that terms such as "regular", "super", and "super plus" would define absorbency within a specified range; and require tampon manufacturers to disclose tampon absorbency, as determined by FDA standards, on the outside of tampon packages.
Several months later, on September 22, 1982, the FDA issued a tentative response agreeing "in substance" with the Citizen Petition. (Px. 6.) It noted, however, a preference to actively work with a task force including manufacturers, consumers and FDA representatives to establish voluntary standards addressing the problems of tampon absorbency, testing and labeling.[7] The FDA also promised to closely monitor the progress of the task force, and to reconsider its position on voluntary standards if it became evident that efforts were frustrated, unduly delayed or were not adequately addressing the immediate issues of absorbency and disclosure.
On November 2, 1982, HRG supplemented and clarified its July 29 Citizen Petition, stating that it considered tampons to be misbranded within the meaning of the Act.[8] It reiterated its request that performance standards for tampons be established.
On April 22, 1983, nine months after HRG filed its petition, the FDA issued a final response denying it. (Px. 7.) Even though the FDA agreed with the objectives of HRG's application and continued to note that absorbency terms were not standardized, consumers nonetheless were left unable to make interbrand comparisons based on the labeling statements. The FDA, however, did state that it would reevaluate the need to take regulatory action in the event that the task force did not propose a satisfactory standard in a timely fashion.
Although a subcommittee of the agency task force agreed upon an absorbency test, the consumer members of the group advised *1017 the FDA, in April 1984, that they believed they were unable to reach a consensus on a disclosure standard. In fact, neither the task force nor the manufacturers on their own, were able to agree on standardized nomenclature.

E.
On May 7, 1984, in light of the failure to reach a consensus, HRG directed still another letter to the FDA (Px. 8), renewing its petition for a tampon absorbency standard or suggesting, in the alternative, that the agency:
[C]onsider proceeding under its general authority to mandate particular labelling requirements for medical devices. Acting under this authority FDA has already required tampon manufacturers to include warning statements about TSS with every tampon package. This authority could be used to require a particular format for disclosing absorbency as well as a method for determining absorbency.
In concluding, HRG noted:
It is unfortunate that for the last two years tampon manufacturers have been able to continue using arbitrary descriptions of absorbency. We hope that FSA will recognize the importance of alleviating this confusion and proceed in the most expeditious manner possible.
Id. at 2 (emphasis added).
On June 29, 1984, to the surprise of many, the FDA publicly released a "Talk Paper."[9] (Px. 10.) It announced long-awaited proposals for consistent tampon labeling so that consumers could compare absorbency between brands. Three reasons were offered for the decision: (1) disclosure of such information would promote public health; (2) a standard proposal from the voluntary task force appeared impossible; and (3) the task force, "develop[ed] and prove[d] the feasibility of a test method for measuring tampon absorbency. Thus a consistent means [existed] for manufacturers to establish the absorbency of their products." Id. at 2.
Several days later on July 9, 1984, the FDA also responded to HRG's letter of May 7, 1984, through John C. Villforth.[10] (Px. 9.) In his response, Director Villforth readily agreed that:
[A] labeling regulation is necessary to assure that consumers can make meaningful interbrand comparisons with respect to absorbency.... We intend to specify in the regulation the absorbency test to be used, with the result to be expressed as a numerical ... factor, somewhat analogous to the sun protection factor used in sunscreens.
Id. (emphasis added). In concluding, he noted: "[W]e will develop a proposed absorbency test and labeling requirement as soon as possible." Id.
Despite what then appeared to be a significant change of course by the FDA, nothing of consequence occurred over the next 12 months although there was an indication that the agency would not give serious consideration to a proposal requiring manufacturers to list tampon ingredients on the package. This position seemed to be based on FDA reasoning that developing requirements for ingredient labeling might cause a delay in developing regulations for absorbency labeling.[11]
Several years later, in August 1987, the Centers for Disease Control ("CDC") published an epidemiological study  Relationship of Tampon Characteristics to Menstrual Toxic Shock Syndrome. JAMA, Aug. 21, 1987, Vol. 258 at 917. (Px. 12.) The CDC Study confirmed, as did the earlier 1982 Tri-State Study,[12] the association *1018 between increased absorbency and enhanced risk of TSS. At the same time, on August 20, 1987, HRG filed a second Citizen Petition (Px. 4), requesting the FDA to require standardized numerical absorbency ratings on tampon packages, to thereby eliminate the use of confusing descriptive terms.
Again, the FDA responded at its customary lethargic pace and took no immediate action. Not until April 25, 1988, eight months later, did the agency respond in a positive manner and issue a notice of proposed rulemaking.
It was not until September 23, 1988, however, that the notice was actually published. 53 Fed.Reg. 37,250 (1988). The Summary provision of the notice provided:
The FDA is proposing to amend its regulations to require that manufacturers of menstrual tampons add to each tampon package label a letter designation of the range of absorbency of the products. The purpose of the proposed rule is to enable consumers to compare the absorbency of one brand and style of tampons with the absorbency of other brands and styles.
* * * * * *
FDA is also announcing the availability of, and requesting comments on, a citizen petition submitted by the Public Citizen Health Research Group (HRG) concerning absorbency labeling for tampons.
Interested persons were invited and requested to submit written comments on the proposal by December 22, 1988.

F.
On January 17, 1989, a telephone status conference was held in this matter amongst all counsel. Defendants' counsel was instructed to file an in camera, ex parte letter explaining what was anticipated with respect to publishing a final rule on tampon absorbency labelling. On January 24, 1989, defendants filed a letter indicating that as of that date, the FDA had reviewed, summarized and organized practically all of the comments it received; draft responses were being prepared for the significant comments and a final rule and preamble were being developed for FDA review. As of that date, defendants expected that a final rule would be published no later than April 30, 1989.
On April 27, 1989 defendants submitted a second letter, updating the previous letter and advising the Court of additional developments with respect to the proposed tampon absorbency labeling regulation.[13] In light of the comments it had received, the FDA believed a reproposal was necessary, allowing for the regular 60 day public comment period, prior to publishing a final regulation. The FDA favored publishing a reproposal rather than a final rule because it wanted to give the public an opportunity to comment on provisions that were not contained in the September notice of proposed rulemaking. Unlike the first letter, defendants did not offer a prediction as to when a final regulation would be promulgated.
On June 12, 1989, the notice of the reproposed regulation was published. 54 Fed. Reg. 25,076 (1989). Interested persons were invited and requested to submit written comments by August 11, 1989. The FDA indicated that a final rule based on the reproposal would become effective for tampon packages initially introduced or initially delivered for introduction into commerce after December 12, 1989.
Shortly after the notice was published, HRG filed a supplemental memorandum arguing that the reproposed regulation was merely an additional delay tactic postponing the issuance of a final rule at least until the close of the comment period. Therefore, plaintiffs argue that this Court should order defendants to issue a final tampon absorbency regulation one month after the close of the comment period or at a date that the Court determines is appropriate.

II. ANALYSIS
The Administrative Procedure Act ("APA") requires that each agency *1019 "proceed to conclude a matter presented to it within a reasonable time." 5 U.S.C. § 555(b). Under § 706(1), reviewing courts are vested with the authority to "compel agency action unlawfully withheld or unreasonably delayed." Although an administrative agency has considerable deference in establishing a timetable for completing its proceedings, such discretion is not unbounded "since the consequences of dilatoriness may be great." Cutler v. Hayes, 818 F.2d 879, 896 (D.C.Cir.1987). See generally, Deering Milliken, Inc. v. Johnston, 295 F.2d 856, 866 (4th Cir.1961). As our Circuit has consistently stated:
There must be a `rule of reason' to govern the time limit to administrative proceedings. Quite simply, excessive delay saps the public confidence in an agency's ability to discharge its responsibilities and creates uncertainty for the parties, who must incorporate the potential effect of possible agency decisionmaking into future plans.
Potomac Elec. Power Co. v. ICC, 702 F.2d 1026, 1034 (D.C.Cir.1983) quoting MCI Telecommunications Corp. v. FCC, 627 F.2d 322, 340 (D.C.Cir.1980). Accord, Public Citizen Health Research Group v. Commissioner, 740 F.2d 21, 32 (D.C.Cir. 1984). Furthermore, unreasonable delay may subject individuals to unnecessary dangers and even inflict harm on those in need of final action.
In determining whether agency action has been unreasonably delayed, this Circuit has identified several factors for the court to consider. The court should "ascertain the length of time that has elapsed since the agency came under a duty to act ... [consider] the reasonableness of the delay ... and ... examine the consequences of the delay." Cutler, 818 F.2d at 897-98; see also Public Citizen Health Research Group v. Comm'r of Food and Drug, 740 F.2d 21, 35 (D.C.Cir.1984) (court should consider "the nature and extent of the interests prejudiced by delay, the agency justification for the pace of decision, and the context of the statutory scheme out of which the dispute arises."). Delays which might be reasonable in the context of economic regulation are "less tolerable when human lives are at stake." Public Citizen Health Research Group v. Auchter, 702 F.2d 1150, 1157 (D.C.Cir.1983).
The facts here speak for themselves. Under the standards established by our Circuit, it is plain that defendants have unreasonably delayed in issuing a tampon absorbency regulation. Since 1981, the FDA has acknowledged and credited[14] scientific studies which have determined that there is an association between tampon absorbency and the incidence of Toxic Shock Syndrome.[15] From January 1982 to August 1986, 1,584 cases of TSS were reported to CDC  36 of which were fatalities. Affidavit of Sidney M. Wolfe, M.D. (August 8, 1988) at ¶ 2. (Px. 2.) In 1986, 352 cases of Toxic Shock Syndrome were reported to CDC. An additional 322 cases were reported in 1987, and 131 cases reported in 1988 prior to June 18. Id. at ¶ 3.
Several years have elapsed since HRG filed its initial petition and the FDA determined that there was an association between tampon absorbency and the incidence of Toxic Shock Syndrome. Over that period, no regulation has been promulgated requiring manufacturers to display standardized absorbency terminology. Without this regulation women cannot compare, from present forms of tampon labeling, the absorbency of a particular brand to another. Without this regulation, women will continue to needlessly subject themselves to the risk of serious injury, and even death from Toxic Shock Syndrome, and they will remain deprived of information that they need to make knowledgeable decisions about selecting tampons.
Defendants' justification for its continued delay in promulgating a regulation is lame at best and wholly irresponsible at *1020 worst. Defendants admit that "consumers cannot make interbrand comparisons on the basis of labeling statements about absorbency." (Px. 7 at 2.) They also admit that FDA's Director of the Center for Devices and Radiological Health confirmed that a "labeling regulation is necessary to assure that consumers can make meaningful interbrand comparisons with respect to absorbency." (Px. 9.) Nevertheless, despite the overwhelming evidence to the contrary, defendants argue that plaintiffs and this Court should defer to its schedule. It also insists that it has done much to enable women to reduce and even eliminate the risk of contracting Toxic Shock Syndrome.
This Circuit states, and defendants readily concede, that an "agency's discretion is not unbounded." Cutler, 818 F.2d at 896. Defendants still claim that deference is proper here and infer that plaintiffs deferred to the FDA's schedule by failing to bring this litigation sooner. This argument, although imaginative, is unreasonable as a claimant's failure or delay in bringing a suit cannot be viewed as condoning an agency's action or inaction. Certainly, the conduct of non-profit organizations, such as plaintiffs, cannot excuse or justify an agency's unreasonable delay in issuing an important regulation.
Defendants cite its promulgation of 21 C.F.R. § 801.430 (1982) as evidence that it was aware of its duty to inform women of the link between tampon usage and TSS. Albeit, the agency did take some action but it was wholly insufficient to thoroughly fulfill its obligation to the public in this instance. Even though a part of § 801.430 advises women to use tampons with the minimum absorbency needed to control menstrual flow, defendants admit that women cannot make an informed choice regarding absorbency amongst brands based on the present labeling. Whatever light defendants argue § 801.430 sheds on TSS is considerably dimmed as women are not armed with adequate information to make informed choices. Defendants cannot claim to have sufficiently carried out its duty to the public while admitting that a tampon absorbency regulation is necessary, on the one hand, yet failing to issue the regulation on the other.
Defendants argue that the Food, Drug, and Cosmetic Act does not impose any duty on the FDA to regulate tampon labeling via notice and comment rulemaking. Again, our Circuit has spoken in this area as "once the FDA [has] elected to respond to its legislative directive ... the APA impose[s] an obligation to proceed with reasonable dispatch." Cutler, 818 F.2d at 895 (emphasis added). Once an agency decides to take a particular action, a duty to do so within a reasonable time is created.
As late as 1984, defendants decided that a regulation standardizing tampon absorbency information was necessary. Since then, on several occasions the FDA planned to require consistent tampon absorbency labeling. Yet it was not until September 23, 1988, that it finally issued a proposed regulation, 53 Fed.Reg. 37,250 (Sept. 23, 1988), followed by a reproposed regulation on June 12, 1989. 54 Fed.Reg. 25,076 (1989). In deciding that a regulation was necessary, the FDA took on the duty to promulgate one in a reasonable time. It cannot hide behind the argument that no duty to do so existed.
Defendants took an unreasonably long period of time to issue a proposed regulation. In fact, for defendants to issue a regulation in the midst of a litigation, is a tactical move to thereby make the issue moot. In Environmental Defense Fund v. E.P.A., 852 F.2d 1316, 1331 (D.C.Cir.1988), our Circuit found that even though the Agency was now conducting the required studies, its history of delays and missed deadlines necessitated a court imposed schedule. See Public Citizen Health Research Group v. Brock, 823 F.2d 626 (D.C. Cir.1987); Telecommunications Research & Action Center v. F.C.C., 750 F.2d 70 (D.C.Cir.1984).
This Court does not view the issue as being moot. The proposed regulation was published on September 23, 1988 and defendants issued a reproposal regulation on June 12, 1989. As it now stands, a final regulation will probably be issued no sooner *1021 than the end of this year.[16] Given that defendants have known of this health danger for over seven years, this delay in issuing a tampon absorbency regulation is wholly unreasonable and unacceptable.
As this Circuit Court stated: "[W]e have seen it happen time and time again, ... action ... for the protection of public health all too easily becomes hostage to bureaucratic recalcitrance, factional infighting, and special interest politics. At some point, we must lean forward from the bench to let an agency know, in no uncertain terms, that enough is enough." Public Citizen Health Research Group v. Brock, 823 F.2d 626 (D.C.Cir.1987).
Unnecessarily, women are unknowingly subjecting themselves to Toxic Shock Syndrome simply because defendants proceed to drag their feet in promulgating a regulation standardizing tampon absorbency labels. Certainly, this delay has existed for more than enough years. Even though defendants are in the process of drafting a final regulation, this Court finds that a more than seven year delay in issuing a regulation impacting on women's health is certainly an unreasonable delay. In fact, waiting until the end of this year for a final regulation or for a regulation to take effect is also an unreasonable amount of time considering the nature of the disease. Therefore, this Court finds that defendants have unreasonably delayed in promulgating a regulation standardizing tampon absorbency labeling.
After analyzing all of the comments that it had received in response to the proposed regulation on standardized labeling for tampon absorbency[17], the FDA decided in mid-June:
... the agency's initial proposal [was] to use a system of letters to represent absorbency ranges and not to standardize currently used terms of absorbency (e.g. regular, super, and super plus), [now] the agency has decided to repropose amendments to § 801.430 that would replace the letter designations with six absorbency terms that are different from currently used terms.... FDA is also now proposing to require that the applicable new term of absorbency be placed on the principal display panel(s) of tampon packages ... The agency believes that the reproposed amendments would ensure truthful, accurate, and nonmisleading labeling and would facilitate interbrand comparisons of tampon absorbency.
54 Fed.Reg. at 25,076 (June 12, 1989). The major differences between the initial proposal and the reproposed regulation is that the latter changes the absorbency standards.[18] The FDA decided that it was more feasible to publish a reproposal including these changes rather than a final rule in order to provide the public with an opportunity to comment on provisions that were not contained in its initial proposal.
The FDA, however, admits that a reproposal was not necessary:
FDA believes that the changes in the initial proposal are in character with the original labeling scheme and that they are a logical outgrowth of the initial proposal and the comments on it. Accordingly, FDA believes that it could justify publishing these reproposed amendments as a final rule.
54 Fed.Reg. 25,076 (June 12, 1989). Defendants argument is not only inconsistent but also undercuts its entire argument. On the one hand, a reproposal of the regulation is not necessary and on the other it is necessary. *1022 This alone shows that defendants argument is weak.
This Circuit has stated that an agency may adopt a final rule which differs from the previously proposed rule without providing an opportunity for notice and comment if the final rule is a "logical outgrowth" of the initial rulemaking record. See e.g., Action Alliance of Senior Citizens of Greater Philadelphia v. Bowen, 846 F.2d 1449, 1455 (D.C.Cir.1988). In fact, in determining whether a revised final rule is promulgated in accordance with the APA, the standard is that the changes in the original rule must be "`in character with the original scheme' and `a logical outgrowth' of the notice and comment already given." Chocolate Mfrs. Ass'n of United States v. Block, 755 F.2d 1098, 1105 (4th Cir.1985) quoting South Terminal Corp. v. EPA, 504 F.2d 646, 658-59 (1st Cir.1974); see also BASF Wyandotte Corp. v. Costle, 598 F.2d 637, 642 (1st Cir.1979).
This Court agrees with the FDA that the reproposed regulation is a logical outgrowth of its initial proposal. The FDA argues that it issued the reproposal to avoid litigation on the issue. Yet, even if this is true, given the caselaw and the facts of this case, a reproposal certainly was not necessary. The Court agrees with plaintiffs that in issuing a totally unwarranted reproposal on standardizing tampon absorbency labeling, defendants merely engaged in another delay tactic to further put off issuing a final regulation.
The notice and comment period for the reproposed regulation closed on August 11, 1989. Defendants plan for the reproposal to effect tampon packages initially introduced or delivered into commerce after December 12, 1989. Therefore, under the APA and defendants' schedule, at a minimum notice of the publication of the final rule should be November 13, 1989.[19]
By their schedule, defendants request over 90 days to analyze comments it received to the reproposal  a reproposal they admit was unnecessary and is similar to their initial proposal. Defendants provide no basis or justification to review the comments for that length of time. This Court believes that in light of all the facts, and now this excessive amount of time to review comments to an unnecessary reproposal, that this time is considerably excessive.
Section 553(d)(3) of the APA provides an exception to the 30 day notice requirement. It allows an agency regulation to become effective in less than 30 days after publication providing that "good cause" exists. Weighing the evidence and facts presented, they persuasively show that "good cause" exists to waive this requirement. Defendants have unreasonably delayed in issuing a proposed regulation as well as a final regulation on an important health issue and published an unnecessary reproposed regulation all under the aegis of agency discretion and deference. Tampon manufacturers have known of this disease since the late 1970's and have been put on notice concerning the necessity of a regulation standardizing tampon absorbency labeling. The delay in promulgating a regulation dealing with this issue has been carried on far too long and demands immediate action.
Therefore, this Court finds that "good cause" exists to require the agency to promulgate its final regulation on standardizing tampon absorbency labeling by October 30, 1989 and that this rule will become effective for tampon packages introduced into commerce at that time.

III. CONCLUSION
The FDA's response to its obligation to protect the public from the risks and dangers associated with Toxic Shock Syndrome has been unreasonable. Its delay in promulgating a final rule standardizing tampon absorbency labeling reflects an insensitivity to a long-existing and clearly identifiable problem. Its delay is particularly disturbing since the public health and human lives are at stake.

ORDER
The Court has considered the several pleadings for relief filed for the parties, all *1023 their supporting memoranda and exhibits, the oppositions thereto, the arguments of counsel, and the entire record in this case. It finds:
(1) That defendants have unduly delayed in issuing a regulation requiring standardized tampon absorbency labeling. The Food and Drug Administration first learned of the association between tampon absorbency and Toxic Shock Syndrome ("TSS") more than seven years ago.
(2) That this unreasonable delay has denied millions of women who use tampons the information needed to make informed choices in selecting lower absorbency tampons to minimize their risk of contracting TSS.
(3) That defendants have offered no reasonable or adequate justification for this delay or for the reproposal of its initial proposed regulation; therefore this Court
DECLARES that defendants have delayed issuing a final regulation requiring standardizing tampon absorbency labeling in violation of both the Administrative Procedure Act, 5 U.S.C. §§ 555(e) and 706(1), and their obligations under the Food, Drug and Cosmetic Act, 21 U.S.C. §§ 352, 371, to protect the public health. It is therefore
ORDERED that defendants shall be enjoined to issue a final tampon absorbency regulation by October 30, 1989. This date is more than 60 days after the close of the notice and comment period, August 11, 1989.
If unable to comply with the above Order, defendants shall identify with specificity all additional issues that need to be resolved and any other reasons. Defendants shall comply with this Order not later than September 12, 1989, and shall serve the plaintiffs immediately and personally with such pleadings. Plaintiffs shall respond to such pleadings by September 19, 1989.

APPENDIX A

DEPARTMENT OF HEALTH & HUMAN SERVICES

January 24, 1989
Honorable Barrington D. Parker
United States District Judge
U.S. District Court for the District of Columbia
Constitution Avenue and John Marshall Place, N.W.
Washington, D.C. 20001
Re: Public Citizen Health Research Group, et al. v. Young, et al., Civil No. 88-1492 (D.D.C. filed June 1, 1988)
Dear Judge Parker:
In accordance with your instructions during the January 17, 1989, status conference in this case, I am filing this letter on the record but in camera and ex parte. The letter addresses each of your inquiries in the order in which you made them.

The Paperwork Reduction Act
The Paperwork Reduction Act appears at 44 U.S.C. § 3501 et seq. Section 3504(h) applies to the Office of Management and Budget's (OMB's) review of the collection of information requirements proposed in section 801.430(e) and (f) of the Food and Drug Administration's (FDA's) proposed rule regarding uniform tampon absorbency labeling (the proposed rule). OMB also reviews certain proposed (and final) rules under Executive Order 12291.

The Proposed Rule
The Commissioner of Food and Drugs signed, on or before June 2, 1988, the proposed rule which, in its final form, was published in the Federal Register of September 23, 1988 (53 Fed.Reg. at 37250-67). The Commissioner forwarded the proposed rule to the Office of the Secretary of the Department of Health and Human Services (DHHS) on or before June 2, 1988. The Secretary signed the proposed rule on or about June 3, 1988, exercising his reservation of authority over certain FDA rulemaking proposals (see 21 C.F.R. § 5.11). *1024 On or about June 6, 1988, the Secretary submitted a copy of the proposed rule to OMB for its review under Executive Order 12291. Thereafter, DHHS and the Commissioner agreed to several modifications of the proposed rule as a result of discussions with OMB. The modifications included the use of letters instead of numerical ranges to represent absorbency, the addition of a range of absorbency ("F"), the deletion of proposed requirements respecting standardization of currently used terms of absorbency, and the addition of specific requests for comment on the proposed effective date and on aspects of the proposed sampling requirements. OMB completed its review of the proposed rule on or about September 16, 1988. DHHS subsequently decided to issue the proposal, and such issuance, i.e., transmittal to the Federal Register, took place on or about September 19, 1988. As noted above, the proposed rule was published in the Federal Register of September 23, 1988.

Status of the Rulemaking Proceeding
The comment period on the proposed rule closed on December 22, 1988 (53 Fed.Reg. at 37263). The agency received a total of 272 comments from individual consumers, consumer groups, tampon manufacturers, health care professionals, and researchers. The comments address virtually every aspect of the proposed rule, beginning with its substantive basis and continuing through FDA's proposed effective date for any final rule based on the proposal. Thus, the comments discuss, among other things, (1) the incidence of Toxic Shock Syndrome and its association with tampon use and tampon absorbency, (2) the legal theories under which tampons would be misbranded within the meaning of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 321(n), 352(a) and 352(f), (3) the use of single numbers, ranges of numbers, and letters to express absorbency, (4) the desirability of standardizing or proscribing the terms currently used by manufacturers to denote the absorbency of their products, (5) the location of absorbency information on tampon package labels and other tampon labeling, (6) the need to reformulate certain styles of certain tampon brands if the proposed rule is adopted, (7) sampling and testing of tampons to determine their absorbency, (8) ingredient labeling, and (9) whether to exempt certain tampons from the requirements of any final rule.
In short, the comments respond to the proposed rule in general and to the many specific questions posed by FDA in the preamble to the proposal (see, e.g., 53 Fed. Reg. at 37255, 37260, and 37261).
As of this date, a staff-level working group, consisting of regulation writers, scientists, policy analysts, and attorneys from FDA's Center for Devices and Radiological Health (which has primary responsibility for the agency's regulation of medical devices), FDA's Office of the Associate Commissioner for Regulatory Affairs, FDA's Office of the Associate Commissioner for Consumer Affairs, and FDA's Office of the Chief Counsel, has reviewed, summarized, and organized virtually all the comments, prepared draft responses to the significant comments, and begun to develop a final rule and preamble for review within FDA.
The working group expects to complete a draft final rule for concurrent circulation within various offices in the agency and, subsequently, the Office of the Commissioner, by the mid-February 1989. Once the Commissioner reviews and signs the final rule, the agency will forward it to the Secretary for his signature, pursuant to 21 C.F.R. § 5.11. Once the Secretary signs the final rule, the Department will forward it to OMB for review under the Paperwork Reduction Act and Executive Order 12291. OMB review is the last step prior to issuance of the final rule by DHHS and publication in the Federal Register, which ordinarily occurs within ten days after the conclusion of OMB review.
Because of the several layers of executive branch review following preparation of the final rule by the working group described above, other matters competing for attention of the interested executive branch officials, and additional factors, it is impossible to predict with confidence when the final rule will be published. As of this *1025 writing, however, we expect that the final rule will be published no later than April 30, 1989.
 Respectfully submitted,
 (s) Michael M. Landa
 Michael M. Landa
 Associate Chief Counsel
 for Enforcement

APPENDIX B

U.S. Department of Justice

April 27, 1989
Honorable Barrington D. Parker
United States District Judge
United States District Court for the District of Columbia
3rd Street and Constitution Avenue, N.W.
Washington, D.C. 20001
Re: Public Citizen Health Research Group, et al. v. Frank E. Young, M.D., et al., Civil No. 88-1492 (D.D.C. filed June 1, 1988)
Dear Judge Parker:
During the telephone status conference in this case on January 17, 1989, you instructed counsel for the government to submit to the Court, on the record but in camera and ex parte, a letter explaining, among other things, what the government anticipated with respect to publication of a final rule regarding tampon absorbency labeling. On January 24, 1989, the government submitted the letter requested by the Court. In that letter the government projected that a final rule would be published by April 30, 1989 (although the government pointed out that due to the various levels of executive branch review through which the rule would have to pass, other matters competing for the attention of the interested executive branch officials, and other factors, it was not possible to predict with confidence the date of publication of a final rule). The government is now submitting this letter, also on the record but in camera and ex parte, to update its January 24, 1989, letter and to advise the Court of further developments with respect to the proposed tampon absorbency labeling rule.
On April 11, 1989, the Food and Drug Administration (FDA) forwarded a draft final rule to the Office of the Secretary of the Department of Health and Human Services (DHHS). After discussions with that office, and with the Office of Management and Budget (OMB), FDA modified several provisions of the rule. FDA now finds it advisable to publish a reproposal, allowing for public comment, prior to publishing a final rule. That reproposal is presently being prepared by FDA. When FDA has completed preparation of the reproposal, it will be forwarded to the Office of the Secretary of DHHS for review. Upon completion of that review, the reproposal will be sent to OMB for its review. The government presently anticipates that the reproposal will be sent to the Federal Register by May 30, 1989, for publication. The reproposal will, pursuant to FDA regulation (21 C.F.R. § 10.40(b)(2)), allow 60 days for public comment.
FDA has determined to publish a reproposal, rather than a final rule, in order to give the public an opportunity to comment on provisions that were not contained in the notice of proposed rulemaking published on September 23, 1988 (53 Fed.Reg. 37250). In that notice, FDA proposed a requirement that manufacturers determine tampon absorbency using a test method specified in the rule and express the results on tampon labeling by use of a letter (A-F) corresponding to one of six ranges of absorbency. The proposed rule would have allowed the continued use of the terms for absorbency currently used in the tampon industry, but requested comment on whether the terms should be standardized to correspond to the ranges of absorbency. The agency received many comments to the effect that the use of letters and nonstandardized terms would be confusing and would not achieve the intended purpose of the rule, that is, to facilitate interbrand comparisons of tampon absorbency.
The use of the proposed six-letter system has been reconsidered and rejected in favor of six new terms for absorbency (low, medium, *1026 etc.) to be placed in a prominent and conspicuous location on the principal display panel of tampon labeling apart from other absorbency information. Neither the new terms nor their placement on the principal display panel were mentioned in the proposed rule.
The D.C. Circuit has determined that an agency may adopt a final rule which differs from the previously proposed rule without affording an opportunity for further public comment if the final rule is a "logical outgrowth" of the rulemaking record on the proposed rule. E.g., Action Alliance of Senior Citizens of Greater Philadelphia v. Bowen, 846 F.2d 1449, 1455 (D.C.Cir. 1988). The courts are also concerned, where a final rule differs from the proposed rule, that the proposal was "sufficiently descriptive to provide interested parties with a fair opportunity to comment and to participate in the rulemaking." Chocolate Manufacturers Ass'n v. Block, 755 F.2d 1098, 1104 (4th Cir.1985).
Although the government believes that the reproposal discussed above is a "logical outgrowth" of the rule proposed in September 1988, neither tampon manufactures nor consumers were afforded an opportunity to comment on the particulars of the labeling scheme included in the reproposal. Publication of the reproposal as a final rule at this time, without further opportunity for public participation could, therefore, result in litigation challenging the rule on procedural grounds and delaying promulgation of a final tampon absorbency labeling rule even further. Under these circumstances, the government believes that publication of a reproposal, rather than a final rule, is the most prudent, and ultimately most expeditious, course.
Following publication of the reproposal and the close of the 60-day comment period, FDA will proceed directly to prepare a final rule. Because comments received on the reproposal will have to be assessed, and the final rule prepared by FDA based on those comments will have to be reviewed both by the Secretary of DHHS and by OMB, it is not now possible for the government to predict with any accuracy the date when a final tampon absorbency labeling rule will be promulgated.
Because the matters discussed in this letter are still under review within the executive branch, this letter, like the one submitted pursuant to the Court's direction in January, is being filed in camera and ex parte. Obviously, when the reproposal is published, the plaintiffs in this case will have notice of the course that the government has elected to follow and will be able to take or refrain from taking further action as they deem appropriate. Nonetheless, the government is advising counsel for the plaintiffs of the submission, but not the contents, of this letter.
 Sincerely,
 (s) Gerald C. Kell
 Gerald C. Kell
 Attorney
 Office of Consumer
 Litigation Civil Division

ON MOTION TO MODIFY OPINION
Upon consideration of defendants' renewed motion to modify the Court's opinion of August 29, 1989, plaintiffs' response thereto, and the entire record in this case, the Court hereby finds that:
(1) defendants have not shown, and did not even attempt to show, that six months is the shortest possible time necessary for compliance with the regulation; and
(2) the record demonstrates that compliance can be accomplished in four months or less; and finally
(3) defendants have not denied the Court's findings of August 29, 1989, or otherwise justified their delay in issuing a regulation requiring tampon absorbency labeling.
Therefore, it is this 29th day of September, 1989,
ORDERED that defendants' renewed motion to modify the Court's opinion of August 29, 1989, is granted in part and denied in part; and it is further
ORDERED that the Court's opinion and order of August 29, 1989, are modified to permit defendants to make their final tampon *1027 absorbency regulation effective up to four months after October 30, 1989, the date by which publication must occur pursuant to the Court's August 29, 1989, order.
NOTES
[1] Public Citizen Health Research Group, a division of Public Citizen, is a nonprofit organization engaged in research and consumer advocacy on public health and safety issues. The two are joined as plaintiffs and are referred to collectively as "HRG."
[2] The OMB is authorized to review proposed and final regulations issued by the FDA and the HHS. Exec.Order No. 12,291, 46 Fed.Reg. 13,193 (1981).
[3] Local Rule 108(h) requires that each motion for summary judgment "shall be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue."
[4] Toxic Shock Syndrome came to the public's attention in the spring and summer of 1980. It was reported to affect young, menstruating women using tampons, many of whom died.
[5] References to exhibits are cited respectively as "Px." (plaintiffs) and "Dx." (defendants).
[6] Counsel for the FDA contend that the Tri-State Study was based on "limited data." Such a claim, however, is weak at best. It was true that the Study did not have a sufficient number of TSS cases for each style of tampon to show statistically significant relative risks for every brand. (Px. 3.) 47 Fed.Reg. 26,982, 26,984 (1982). But even in view of that "alleged problem", both the Institute of Medicine and the FDA's Obstetrics-Gynecology Devices Panel accepted the Study as supporting and requiring absorbency labeling. (Pxs. 1 and 11.)
[7] The task force was sponsored by and worked under the guidance of the American Society for Testing and Materials.
[8] Section 502(a) of the Federal Food, Drug and Cosmetic Act ("the Act"), 21 U.S.C. § 352(a) provides that a device shall be deemed misbranded if its labeling is false or misleading in any particular way. In determining whether an article is misbranded because the labeling is misleading, section 201(n) of the Act provides that the FDA shall consider whether the labeling "fails to reveal facts with respect to consequences which may result from the use of the article to which the labeling ... relates."
[9] Talk Papers are prepared by the FDA Press Office to guide FDA personnel in responding consistently and accurately to questions from the public on topics of current interest. Talk Papers are subject to change as more information becomes available and are not intended for general distribution outside of FDA. All information included in them, however, is public.
[10] Director, Center for Devices and Radiological Health.
[11] The ingredient labeling proposal was advanced by the FDA Obstetrics-Gynecology Devices Panel. (Px. 11.)
[12] See supra (Px. 3).
[13] The two letters are attached as appendices to this Memorandum Opinion.
[14] 46 Fed.Reg. 23,767 (Apr. 28, 1981); 47 Fed. Reg. 26,984, 26,987 (June 22, 1982).
[15] M. Osterholm, et al., Tri-State Toxic Shock Syndrome Study Epidemiological Findings, 145 J. Infectious Diseases 431 (1982) (Px. 3); S. Berkeley, et al., The Relationship of Tampon Characteristics to Menstrual Toxic Shock Syndrome, 258 JAMA 917 (1987) (Px. 12).
[16] In the Dates section of the reproposed rule, defendants state: "The agency is proposing that any final rule based on the reproposal become effective for packages of tampons initially introduced or initially delivered for introduction into commerce after December 12, 1989." 54 Fed. Reg. 25,075, 25,076 (June 12, 1989).
[17] 53 Fed.Reg. 37,250 (Sept. 23, 1988).
[18] In its initial proposal, the FDA chose to use a system of letter designations to represent absorbency ranges. In the reproposed regulation, the agency is requiring a new set of terms (low absorbency, medium absorbency, high absorbency, very high absorbency and highest absorbency). It also requires that the new terms be placed in a prominent and conspicuous location on the main display panel and that the package label include an explanation of the range of absorbency and its corresponding terms. 54 Fed.Reg. 25,076 at 25,077.
[19] Section 553(d) of the APA requires that notice of the rule by publication must be made no less than 30 days before its effective date. 5 U.S.C. § 553(d).